NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

───────────────

MICHAEL JOSEPH REILLY, et al., *Plaintiffs/Appellants*,

*v.*

MAYO CLINIC ARIZONA, *Defendant/Appellee*.

No. 1 CA-CV 23-0566

FILED 05-16-2024

───────────────

Appeal from the Superior Court in Maricopa County
No.  CV2018-000020
The Honorable Randall H. Warner, Judge

**AFFIRMED**

───────────────

COUNSEL

Palumbo Wolfe & Palumbo PC, Phoenix
By Elliot G. Wolfe
*Counsel for Plaintiffs/Appellants*

Snell & Wilmer LLP, Phoenix
By Robert H. Feinberg, Derek Flint, Colin P. Ahler
*Counsel for Defendant/Appellee*

_____

**MEMORANDUM DECISION**

Judge Michael S. Catlett delivered the decision of the Court, in which Presiding Judge Angela K. Paton and Judge James B. Morse Jr. joined.

_____

**C A T L E T T**, Judge:

¶1             Following a bench trial, the superior court ruled against Michael Reilly ("Reilly") and in favor of Mayo Clinic Arizona ("Mayo Clinic") on Reilly's claim for medical malpractice.  Reilly appeals, challenging several of the court's findings and claiming the judge should have recused himself.  We conclude that none of the court's findings were clearly erroneous, and the judge was not required to recuse.  We affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2             After experiencing persistent abdominal pain, Reilly visited the emergency room at Mayo Clinic, where physicians prescribed medication.  Reilly returned two days later again complaining of abdominal pain.  Concerned Reilly might have a pancreatic tumor, doctors ordered a CT scan and admitted him to the hospital.  The radiologist who performed the CT scan observed a 2.3-centimeter hyperdense mass on the head of Reilly's pancreas but could not determine whether the mass was a tumor or fatty tissue.  The radiologist thought Reilly should undergo an MRI.  Another doctor evaluated Reilly and recommended an Endoscopic Ultrasound and Fine Needle Aspiration ("EUS-FNA") to rule out cancer.

¶3             A third doctor, Dr. Rahul Pannala, who is a gastroenterologist, reviewed Reilly's symptoms and the size of the mass and recommended an EUS-FNA because, according to him, an MRI would not definitively rule out a tumor.  Reilly agreed to undergo an EUS-FNA, which Dr. Pannala performed.  Dr. Pannala documented that the procedure was accomplished "without difficulty" and that Reilly "tolerated the procedure well."  The sample from the EUS-FNA tested negative for cancer.

¶4             Several days later, Dr. Douglas Faigel, a professor of medicine at Mayo Clinic emailed Dr. Pannala stating that the CT scan and the images from the procedure did not convince him that the mass on Reilly's pancreas was a tumor.  Dr. Faigel estimated the probability of a tumor at 50% before the procedure and less than 10% after.  About a year and a half after the

procedure, Dr. Pannala exchanged texts with another doctor who asked about Reilly's medical history. Dr. Pannala stated he "didn't have access to the medical records," but he recalled the EUS-FNA "was straightforward but [Reilly] likely had a traction injury and tear."

¶5            After the procedure, Reilly woke up with what he described as the "worst pain." A CT scan performed the day after the procedure showed no signs of perforations in the area where the EUS-FNA occurred. Several days later, Reilly had an elevated white blood cell count and additional CT scans revealed evidence of perforations. Reilly underwent exploratory surgery, and the doctor found bile drainage that was likely infected, multiple perforations in his duodenum (part of the small intestine), and two perforations in the common bile duct. Doctors eventually removed Reilly's duodenum and removed and reattached the bottom third of his stomach. Reilly suffered severe complications rendering him physically incapable of working or participating in activities he enjoys.

¶6            Reilly filed a complaint in superior court, alleging Mayo Clinic, Mayo Clinic Arizona, and two doctors[1] were negligent in providing medical care. Following discovery, Reilly's negligence claim proceeded to a bench trial.

¶7            Reilly testified at trial that he remembered signing a consent form for the EUS-FNA procedure, but he stated no one discussed the risks or alternatives with him, and he did not remember seeing Dr. Pannala. Reilly testified that if he had been "told that an MRI could diagnose the difference between whether or not you had a tumor or whether you had normal tissue in the pancreas," he would have elected an MRI.

¶8            Dr. Pannala testified that it was his custom and practice to discuss the risks of the EUS-FNA with patients and get their informed consent. Dr. Pannala admitted that he did not discuss an MRI with Reilly because, in his medical judgment, an MRI would not have provided the information necessary for further treatment.

¶9            Reilly's medical expert, Dr. Rudolph Bedford, testified that Dr. Pannala breached the standard of care for informed consent by failing to give Reilly the option of an MRI. As a result, Reilly "was not informed of all of the potential possibilities and also alternative methods[.]" Dr.

---

[1]            Reilly agreed to dismiss his negligence claim against the two doctors and Mayo Clinic, leaving Mayo Clinic Arizona as the only defendant.

Bedford also testified that, "within a reasonable probability," an MRI would have allowed Reilly's doctors to determine whether the mass observed on his pancreas was fatty tissue or a tumor.

¶10        Dr. Bedford also testified that Dr. Pannala breached the standard of care when performing the EUS-FNA because he perforated Reilly's common bile duct.  Dr. Bedford questioned whether the procedure should have been performed at all based on Reilly's duodenal diverticulum being in a "somewhat concerning" place.  He said there was a "reasonable probability" the perforations may have weakened the wall of the duodenum.  He testified that the perforations also could have resulted from a "traction injury," which can occur when a scope with a rigid tip pulls and pushes against tissue.  Dr. Bedford explained there was a possibility that it was traction from the scope "to the duodenal out-pouching that weakened the wall of the duodenum," resulting in a "traction injury."

¶11        Mayo Clinic's medical expert, Dr. Augustin Attwell, testified that Dr. Pannala met the standard of care for informed consent.  Dr. Attwell explained that he would have been "highly concerned" that Reilly had a neuroendocrine tumor based on the CT scan and would not have "wast[ed] time on an MRI."  Dr. Attwell did not believe an MRI was "appropriate" because there was a "clearly identifiable 2.3 centimeter lesion" that was "hyperdense" and, in his opinion, there was "at least [an] 80, probably more like 90 percent [chance] of a neuroendocrine tumor or an adenocarcinoma." Although the likelihood of cancer was less than 10 percent, a "normal" MRI would not have excluded cancer.

¶12        Dr. Attwell also testified that Dr. Pannala met the standard of care while performing the EUS-FNA.  Dr. Attwell agreed with Dr. Pannala's technique and explained that a CT scan performed the day after the EUS-FNA did not show perforations.   He testified that unintentional perforations of the bile duct can occur even when exercising reasonable care, but they ordinarily do not cause concern because they "almost always heal."  He testified that the risk of serious complications from the EUS-FNA was only one in 1,500 to 3,000, depending on the study being relied upon. He also testified that the description of the perforations following Reilly's exploratory surgery were inconsistent with a traction injury.

¶13        The superior court concluded Mayo Clinic was not negligent. The court found that "Dr. Pannala testified that he spoke with Mr. Reilly and explained to him the risks of the EUS-FNA procedure and the reasons for it" but "Mr. Reilly has no recollection of this discussion."  The court noted that serious complications from an EUS-FNA occur in about one in

1,500 or 2,000 procedures. The court found credible Dr. Pannala's testimony that an MRI was not necessary because it would not have definitively shown whether the mass was a tumor. The court concluded that an "EUS-FNA would be necessary to rule out a tumor regardless of whether an MRI was done" and if the choice of an MRI was put that way to Reilly he "likely would have consented to the EUS-FNA because the consequences of not diagnosing a cancerous tumor are so severe and because the risk of serious complications from an EUS-FNA was relatively low." Thus, Dr. Pannala met the standard of care for informed consent.

¶14     The court also found that Dr. Pannala likely caused the two perforations in the common bile duct during the EUS-FNA. The court thought the cause of the perforations in Reilly's duodenum was "less clear," but they were most likely caused by weak areas in the duodenum that were further eroded by bile leaking from the common bile duct perforations. The court found credible Dr. Attwell's testimony that the common bile duct can be inadvertently perforated during an EUS-FNA even while exercising reasonable care. While the perforations in Reilly's common bile duct likely caused further perforations in the duodenum, the court described those results as "extraordinarily rare[.]" The court found Dr. Pannala met the standard of care for an EUS-FNA because the perforations of Reilly's bile duct were inadvertent, even though the perforations did not heal on their own "with calamitous results[.]"

¶15     Reilly filed a motion for new trial, arguing the evidence did not support the verdict. The superior court denied the motion and entered final judgment in Mayo Clinic's favor.

¶16     Reilly timely appealed. We have jurisdiction. *See* A.R.S. § 12-2101(A)(5)(a).

## DISCUSSION

¶17     Reilly argues the superior court erred in finding that Mayo Clinic was not negligent in obtaining his informed consent for the EUS-FNA or while performing that procedure. In an appeal following a bench trial, "we review the evidence in a light most favorable to sustaining the verdict," and will accept the superior court's factual findings "unless clearly erroneous, giving due regard to the opportunity of the court to judge the credibility of witnesses." *Castro v. Ballesteros-Suarez*, 222 Ariz. 48, 51 ¶ 11 (App. 2009); Ariz. R. Civ. P. 52(a)(6). "A finding of fact is not clearly erroneous if substantial evidence supports it, even if substantial conflicting evidence exists." *Castro*, 222 Ariz. at 51–52 ¶ 11. Substantial evidence exists

if a reasonable person could reach the same result as the superior court. *Id.* at 52 ¶ 11. We review questions of law *de novo*. *Id.* ¶ 12; *Ariz. Bd. of Regents v. Phx. Newspapers, Inc.*, 167 Ariz. 254, 257 (1991).

¶18 The elements of medical malpractice are the same as negligence–a "plaintiff must prove the existence of a duty, a breach of that duty, causation, and damages." *Seisinger v. Siebel*, 220 Ariz. 85, 94 ¶ 32 (2009). Informed consent claims "involving the doctor's obligation to provide information, must be brought as negligence actions." *Duncan v. Scottsdale Med. Imaging, Ltd.*, 205 Ariz. 306, 310 ¶ 13 (2003). In a medical negligence action, "a plaintiff must prove that (1) '[t]he health care provider failed to exercise that degree of care, skill and learning expected of a reasonable, prudent health care provider in the profession or class to which he belongs within the state acting in the same or similar circumstances,' and (2) '[s]uch failure was a proximate cause of the injury.'" *Windhurst v. Arizona Dep't of Corr.*, 256 Ariz. 186, __ ¶ 14 (2023) (quoting A.R.S. § 12-563).

## I.     Breach - Informed Consent

¶19 Reilly argues the superior court erred in finding that Mayo Clinic, through Dr. Pannala, complied with the standard of care for informed consent when he did not give Reilly the option of undergoing an MRI before the EUS-FNA. Reilly asserts that the court erred in finding that he "likely would have given consent for an EUS-FNA if an MRI had been offered and done, and showed normal tissue" because he testified otherwise.

¶20 Reilly misconstrues the court's findings. The court found that an "EUS-FNA would be necessary to rule out a tumor regardless of whether an MRI was done." The court further found that if Mayo Clinic had explained the MRI option that way, Reilly "likely would have consented to the EUS-FNA because the consequences of not diagnosing a cancerous tumor are so severe and because the risk of serious complications from an EUS-FNA was relatively low."

¶21 Reilly has not shown that either finding was clearly erroneous. Reilly was questioned at trial as follows: If an "MRI could diagnose the difference between whether or not you had a tumor or whether you had normal tissue in the pancreas would [you] have opted for it?" Reilly responded that he would have chosen an MRI. The court, however, made a factual finding that an MRI could not have conclusively ruled out the existence of a pancreatic tumor, thereby undercutting the premise of Reilly's testimony. While Dr. Bedford's expert testimony and

other evidence supports that an MRI could have ruled out cancer, Dr. Pannala and Dr. Atwell testified otherwise. We cannot reweigh evidence on appeal and find that an MRI could have ruled out a tumor when the superior court, based on conflicting trial testimony, found otherwise. *See Ruesga v. Kindred Nursing Ctrs., LLC*, 215 Ariz. 589, 597 ¶ 27 (App. 2007) ("To the extent the parties presented facts from which conflicting inferences could be drawn . . . , it was for the trial court, not this court, to weigh those facts.").

**¶22** The court also did not clearly err in finding that Reilly likely would have consented to the EUS-FNA given the severe consequences of not diagnosing cancer and the low risks of serious complications. Dr. Atwell testified that serious complications from an EUS-FNA occur in one in every 1,500 to 3,000 procedures. Reilly, too, acknowledges that the complications he suffered after the EUS-FNA have never been "seen, heard of, or . . . reported in all the world's medical literature." When sitting as the trier of fact, the superior court, like a jury, may rely on common sense and experience in resolving factual issues. *See State v. Aguilar*, 169 Ariz. 180, 182, 818 P.2d 165, 167 (App. 1991) ("[J]urors may rely on their common sense and experience[.]"). Having found that there was no other option for ruling out a pancreatic tumor, and that there was an infinitesimal risk of serious complications, the court did not clearly err in finding that Reilly would have consented to the EUS-FNA.

**¶23** Reilly also argues the court erred in finding that the EUS-FNA was justified, relying on evidence that Dr. Faigel told Dr. Pannala that he was "not at all convinced that this is a tumor, especially a neuroendocrine tumor." But Dr. Faigel sent the email making that statement several days *after* Reilly's EUS-FNA and, in it, Dr. Faigel put the probability of a tumor at 50% before the procedure. Dr. Faigel's email does not establish that the court's findings were erroneous.

**¶24** Reilly emphasizes other evidence he claims contradicts the court's findings: the mass could have been (and was) only fatty tissue; a radiologist recommended an MRI; Dr. Pannala chose not to tell him about that option; and his medical expert testified that Dr. Pannala's omission did not meet the standard of care. While that evidence conflicts with Mayo Clinic's evidence, it does not negate the substantial evidence in the record supporting the court's factual findings. Again, conflicting evidence is not a sufficient basis for us to reverse. *In re U.S. Currency in Amount of $26,980.00*, 199 Ariz. 291, 295 ¶ 9 (App. 2000).

## II.      Breach - The EUS-FNA

**¶25**          Reilly also argues the court clearly erred in finding that Mayo Clinic was not negligent while performing the EUS-FNA.  The court found that Dr. Pannala likely caused the two perforations in the common bile duct, and those perforations likely resulted in bile leaking and causing further perforations.  But the court found that Dr. Pannala did not breach the standard of care because "the common bile duct can be inadvertently perforated during a fine needle aspiration of the pancreas despite the exercise of reasonable care."

**¶26**          Dr. Pannala and Dr. Atwell testified that the common bile duct can be perforated during an EUS-FNA despite reasonable care.  Dr. Atwell further testified that Dr. Pannala met the standard of care for the EUS-FNA because he acted reasonably, and unintentional perforations can occur but "almost always heal."  On appeal, Reilly admits that "[t]here was a dispute between the experts about whether a perforation of the common bile duct could occur in the absence of negligence:  The defense expert, Dr. Atwell, said it could.  The plaintiff's expert, Dr. Bedford said it should not."  The court resolved that "battle of experts" in favor of Mayo Clinic.  We cannot second guess that choice on appeal.

**¶27**          Reilly argues he "suffered injuries and damages that no other gastroenterologist or endoscopist, performing this same procedure . . . likely hundreds of thousands of times—had ever once seen, heard of, or reported in the entire world literature."  Reilly's description of his injuries as rare is consistent with the court's findings.  Yet rarity of injury does not establish breach of the standard of care.  In fact, rarity of injury could demonstrate a lack of foreseeability and, thus, a lack of breach or proximate cause.  *See Gipson v. Casey*, 214 Ariz. 141, 144 ¶ 16 (2007) ("[F]oreseeability often determines whether a defendant acted reasonably under the circumstances or proximately caused injury to a particular plaintiff.").  But, ultimately, the superior court did not rely on a lack of foreseeability.  Instead, the superior court agreed with expert testimony that a medical professional can fully comply with the standard of care in performing an EUS-FNA and still perforate the common bile duct.  Despite the rare and tragic injuries Reilly suffered during and after his EUS-FNA, we cannot overturn the court's factual finding on appeal when supported by substantial evidence, as it is here.  *See Hale v. Window Rock Unified Sch. Dist.*, 252 Ariz. 420, 425 (App. 2021) ("But issues of breach and causation necessarily implicate factual determinations that are reserved to designated fact finders[.]").

### III.    Judicial Bias

¶28    The superior court judge did not disclose his spouse's employment as executive director of a palliative care facility at which fellows from the Mayo Clinic College of Medicine and Science ("the Mayo Clinic College") volunteer. Reilly contends that omission violated Rule 2.11 of the Arizona Code of Judicial Conduct and should result in a new trial.

¶29    As an initial matter, Mayo Clinic argues that Reilly waived his judicial bias argument in two ways. Mayo Clinic first contends that Reilly failed to raise the issue with the superior court. Mayo Clinic argues Reilly could have raised the argument earlier because the judge's financial disclosure statement on file with the Arizona Secretary of State lists his spouse's employment. Generally, failure to raise an issue with the superior court results in waiver on appeal. *Cont'l Lighting & Contracting, Inc. v. Premier Grading & Utils., LLC*, 227 Ariz. 382, 386 ¶ 12 (App. 2011). We are not persuaded, however, that litigants must comb through a judge's financial statements to determine if there is a potential conflict of interest. Instead, the Judicial Code of Conduct requires a judge to disclose "information that the judge believes the parties or their lawyers might reasonably consider relevant to a possible motion for disqualification, even if the judge believes there is no basis for disqualification." Ariz. Co. Jud. Cond. 2.11 cmt. 5.

¶30    Mayo Clinic also argues that Reilly waived the issue by failing to comply with Arizona Rule of Civil Appellate Procedure 13(a)(7). Mayo Clinic asserts that Reilly's "Opening Brief—with its three sentences of citation-free 'argument' regarding alleged judicial bias—fails to comply with the basic procedural requirements of [Rule] 13(a)(7)" and that Rule 13(a)(7) does not allow "a party to incorporate a prior motion by reference[.]" Rule 13(a)(7) instructs that the "argument" section of an opening brief must contain support for each of appellant's contentions, citations to legal authorities, and references to the portions of the record on which appellant relies. Ariz. R. Civ. App. P. 13(a)(7). Here, the judicial bias section of Reilly's opening brief mostly incorporates by reference a previous motion to stay Reilly filed with this court. While doing so violates Rule 13(a)(7), we address Reilly's argument because it implicates judicial conduct. *Cf. Duncan v. Progressive Preferred Ins. Co. ex rel Estate of Pop*, 228 Ariz. 3, 6 ¶ 12 (App. 2011) (addressing issue on appeal even though it was not raised in the superior court because "orderly judicial administration is a matter of statewide public importance").

**¶31**        Reilly has not established judicial bias requiring recusal.  Rule 2.11 instructs that "[a] judge shall disqualify himself in any proceeding in which the judge's impartiality might reasonably be questioned," such as when the judge knows that his spouse is "a person who has more than a de minimis interest that could be substantially affected by the proceeding."  Ariz. Co. Jud. Cond. 2.11(A)(2)(c).  Rule 2.11 also requires a judge to disqualify himself when the judge's spouse "has an economic interest . . . in the subject matter in controversy or in a party to the proceeding."  Ariz. Co. Jud. Cond. 2.11(A)(3).

**¶32**        A party who challenges a judge's impartiality "must overcome the presumption that [superior court] judges are 'free of bias and prejudice.'"  *Stagecoach Trails MHC, LLC v. City of Benson*, 232 Ariz. 562, 568 ¶ 21 (App. 2013) (citations omitted).  To do so, the challenging party must "set forth a specific basis for the claim of partiality and prove by a preponderance of the evidence that the judge is biased or prejudiced."  *Simon v. Maricopa Med. Ctr.*, 225 Ariz. 55, 63 ¶ 29 (App. 2010); *Stagecoach Trails MHC, LLC*, 232 Ariz. at 568 ¶ 21 ("Judicial rulings alone do not support a finding of bias or partiality without a showing of an extrajudicial source of bias or a deep-seated favoritism.").

**¶33**        Reilly provides only speculation about bias, not evidence of bias.  The Mayo Clinic College offers a Hospice and Palliative Medicine Fellowship.  That fellowship gives participants an opportunity to train in various palliative-care facilities.  The fellowship program collaborates with Hospice of the Valley—a not-for-profit hospice organization in Phoenix.  Hospice of the Valley is a care partner of Ryan House—a separate hospice and palliative care facility—and provides palliative care to patients at Ryan House.  As part of the fellowship, the Mayo Clinic College's students can provide care to patients at Ryan House.  At the time of trial, the superior court judge's spouse was the Executive Director at Ryan House.

**¶34**        The relationship between Mayo Clinic and the superior court judge's spouse is far too attenuated to establish bias or require recusal.  Reilly has submitted no evidence that anyone involved in this case for Mayo Clinic is involved with the Mayo Clinic College's fellowship program, Ryan House, or Hospice of the Valley.  And, in any event, the judge's spouse is several steps removed from anyone with involvement here.  To credit Reilly's judicial bias theory, one would have to ignore the distinction between (i) the judge's spouse and Ryan House, (ii) Ryan House and Hospice of the Valley, (iii) Hospice of the Valley and the Mayo Clinic College's fellowship program, (iv) the Mayo Clinic College's fellowship program and the Mayo Clinic College, and (v) the Mayo Clinic College and

Mayo Clinic (the defendant here). Merely identifying an attenuated relationship between Mayo Clinic and Ryan House, without more, does not establish that the superior court judge's spouse had an interest that was economic or more than *de minimis*. *See* Ariz. Co. Jud. Cond. 2.11(A)(2)(c), (A)(3). Reilly has not presented the actual evidence necessary to overcome the presumption of impartiality or otherwise establish that the superior court judge was required to recuse.

## CONCLUSION

¶35 We affirm the judgment.



AMY M. WOOD • Clerk of the Court
FILED: TM